Matthew T. Stone, Esquire
New Jersey Attorney Identification No.  014882007
**MURRAY, STONE & WILSON, PLLC**
One Belmont Avenue, Suite 310
Bala Cynwyd, Pennsylvania 19004
215-947-5300 (Phone); 813-251-2209 (Fax)
Email:  mstone@mswlawgroup.com
*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| THERESA DANTE; THEODORE HUSS; JULIET HINRICHS; SAMANTHA OGGS; and MARGARET GATES,<br><br>Plaintiffs,<br><br>v.<br><br>JOSEPH SCHWARTZ; ROSIE SCHWARTZ; SKYLINE HEALTH CARE, LLC; SKYLINE MANAGEMENT GROUP, LLC; CORNERSTONE QUALITY CARE, LLC; COTTONWOOD HEALTHCARE, LLC; FIRST LANDING INFORMATION SERVICES, LLC; and JACK JAFFA a/k/a CHAVA JAFFA,<br><br>Defendants. | Civil Action No.  2:20-CV-01047-JMV-JBC |

### MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT JACK JAFFA'S MOTION TO DISMISS SECOND AMENDED <u>COMPLAINT</u>

Plaintiffs Theresa Dante, Theodore Huss, Juliet Hinrichs, Samantha Oggs and Margaret Gates ("Plaintiffs"), individually and on behalf of a class of similarly situated individuals, by and through their counsel, Murray, Stone & Wilson, PLLC, hereby submits the following Memorandum of Law in Support of their Opposition to Defendant Jack Jaffa's ("Mr. Jaffa") Motion to Dismiss Second Amended Complaint ("SAC").

**PRELIMINARY STATEMENT**

Mr. Jaffa conspired with Joseph Schwartz to steal Plaintiffs' insurance premiums. Full stop. The SAC details how this conspiracy was perpetrated, when it was perpetrated and why it was perpetrated. It further details Mr. Jaffa's unique role in furtherance of the conspiracy. Plaintiffs, who were all employees of midwestern nursing homes, learned of this theft when they underwent medical procedures, only to be told that despite the appearance of valid insurance on paper, their plan was not funded, and they were liable for significant medical bills. This conspiracy occurred during the calendar years 2017 and 2018 and was made possible through Jack Jaffa's creation of a phony company, Cornerstone Quality Care, LLC ("Cornerstone"), the sole purpose of which was to act as Plaintiffs' "employer" during the class period. As the faux employer, Mr. Jaffa caused Cornerstone Quality Care to siphon off health insurance premiums from Plaintiffs' paychecks while refusing to fund the insurance plan, causing the third-party administrator to write to Mr. Jaffa to explain that it was terminating the plan. Unfortunately, by this point, the damage was done.

**I.   FACTS ALLEGED IN THE COMPLAINT**

Jack Jaffa created Cornerstone Quality Care on December 13, 2016 and was its managing member. SAC at ¶ 45. From 2017 to 2018, Jack Jaffa and Joseph Schwartz conspired to have Cornerstone Quality Care serve as the employer of the class members, despite their actual employment with myriad midwestern nursing homes. SAC at ¶¶ 45, 46. This lie appeared on Plaintiffs' 1095-C tax forms. *Id.* Mr. Jaffa then directed "salesmen" to visit these midwestern nursing homes in an effort to enroll the employees in what was intended to be a bogus insurance plan. SAC at ¶ 48. On March 29, 2018, the third-party plan administrator, American Plan Administrators ("APA") sent a letter ***to Jack Jaffa***, castigating him for making false statements

about his intention to fund the insurance plans, and stating its intention to terminate its involvement. SAC at ¶ 51. Importantly, Plaintiffs are not seeking to hold Mr. Jaffa liable for the torts of Cornerstone Quality Care, but rather for his own tortious conduct in defrauding Plaintiffs. These facts are specific, they are targeted, and they are sufficient to overcome Mr. Jaffa's Rule 12 and Rule 9 challenges.

## II. ARGUMENT

### A. Standard of Review

For a complaint to survive dismissal under Rule 12(b)(6), it must contain sufficient factual matter to state a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In instances of fraud, a plaintiff must plead fraud with sufficient particularity such that he puts the defendant on notice of the "precise misconduct with which [he is] charged." *Lum v. Bank of Am.*, 361 F.3d 217, 223-24 (3d Cir. 2004), abrogated in part on other grounds by *Twombly*, 550 U.S. at 557. "To satisfy this standard, the plaintiff must plead or allege the date, time, and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007). Though to be sure, while allegations of "date, place or time" fulfill these functions, but nothing in the rule requires them. *Seville Industrial Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786 (3d Cir. 1984).[1] At a minimum, a plaintiff "must

---

[1] It is not clear whether the Third Circuit purposely replaced the disjunctive, "date, time *or* place" set forth in, *Seville Industrial Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786, 791 with the conjunctive "date, time *and* place," suggested in *Frederico*. Regardless, Plaintiffs have alleged facts sufficient to satisfy either standard. Mr. Jaffa is on notice of the claims against him.

allege who made a misrepresentation to whom and the general content of the misrepresentation." *Lum*, 361 F.3d at 224. To provide reasonable notice in a case involving conspiracy, a complaint must plausibly suggest that the individual defendant actually joined and participated in the conspiracy. *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 179 (E.D. Pa. 2011). Under Rule 12(b)(6), the Court must "accept as true the facts alleged in the complaint and all reasonable inferences that can be drawn from them" and dismissal "for failure to state a claim is limited to those instances where it is certain that no relief could be granted under any set of facts that could be proved." *See Markowitz v. Ne. Land Co.*, 906 F.2d 100, 103 (3d Cir. 1990) (citations omitted).

### B. Plaintiffs' Allegations are Sufficient to Satisfy Rules 12 and 9

Mr. Jaffa's Motion, despite its length, is not serious. It is a standard Rule 12 Motion that outlines federal pleading practice, and then characterizes Plaintiffs' allegations as some iteration of "threadbare" or "conclusory" on virtually every page. It is a motion that could be filed in every case, regardless of the allegations made. By repeating the mantra "group pleading," Mr. Jaffa is hoping that the Court ignores the specific allegations against him. This will not work. *Monterey Bay Military Hous., LLC v. AMBAC Assur. Corp.*, 2021 U.S. Dist. LEXIS 62687 (S.D.N.Y. Mar. 31, 2021) (rejecting "group pleading" argument when each Defendant was apprised of its specific wrongdoing).

Plaintiffs have alleged ten counts, the first seven of which are subject to a Rule 9 analysis as they rely on some allegation of fraud. Counts VIII (Breach of Fiduciary Duty), IX (Negligence) and X (Conversion), are not subject to the heightened pleading requirements and can be examined under the less onerous Rule 12.

## 1. **Plaintiffs Adequately Plead a Claim under RICO (Count I)**

To plead a RICO claim under § 1962(c), "the plaintiff must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Lum v. Bank of Am.*, 361 F.3d 217, 223 (3d Cir. 2004) (citing *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)). According to the statute, an "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). A plaintiff must show a shared "purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 370 (3d Cir. 2010) (quoting *Boyle v. United States*, 556 U.S. 938, 946 (2009)). Like allegations of fraud generally, a plaintiff can satisfy pleading fraud under RICO by "pleading the 'date, place or time' of the fraud, or through 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Kenney v. Am. Bd. of Internal Med.*, 847 Fed. Appx. 137, 146 (3d Cir. Feb. 25, 2021) (citing *Lum v. Bank of Am.*, 361 F.3d 217, 223-24 (3d Cir. 2004)).

Plaintiffs sufficiently allege each element of RICO as against Mr. Jaffa. First, the conduct in question is set forth in section I *supra*; Mr. Jaffa conspired with Mr. Schwartz to steal insurance premiums by creating a dummy company to pose as Plaintiffs' employer and then pocket the collected premiums. Second, the enterprise in-fact is demonstrated by the fact that Mr. Jaffa used Mr. Schwartz's address – 40 Vreeland Avenue – on the 1095-C tax form, SAC at ¶45, and were co-recipients of the APA letter terminating their services ***and accusing both men of lying***. SAC at ¶ 51. And third and fourth, Plaintiffs allege the following pattern of racketeering activity:

> a. Made or transmitted fraudulent and material misstatements to the Skyline Facilities' staff members concerning the procurement of health

    and dental insurance between January 1, 2017 and May 1, 2018;

  b. Submitted false tax forms to the Internal Revenue Service indicating that the Skyline Enterprise was in compliance with the Affordable Care Act from January 1, 2017 and May 1, 2018;

  c. Documented and submitted false payroll information to staff members indicating that insurance premium payments were deducted the staff members' pay and applied to insurance obligations;

  d. Fraudulently transmitted funds from the paychecks of the class members' paychecks to Defendants' own coffers from January 1, 2017 and May 1, 2018.

SAC at ¶ 87. Subsections a and b of paragraph 87 are demonstrated – ***and conclusively proven*** – by the exemplar 1095-C of Juliet Hinrichs, which fraudulently states that her employer is Cornerstone Quality Care, LLC, and that she possessed health insurance. SAC at 45. And, despite seeing deductions from the paystubs for health insurance, these sums were ***not*** paid to the plan administrator. SAC at ¶ 51. In fact, APA specifically accused Jack Jaffa—not a low-level employee[2] of Cornerstone—of lying to them. *Id.*

  In a footnote, Mr. Jaffa suggests that Plaintiffs are seeking to hold him liable for the torts of his company, Cornerstone Quality Care, LLC. This is false. As this Court has recognized, an LLC member can be held personally liable for a tort committed by the LLC "when he or she is sufficiently involved in the commission of the tort." *United Capital Funding Grp., LLC v. Brick City Brewing, LLC*, 2021 U.S. Dist. LEXIS 214457, *6 (D.N.J. Nov. 4, 2021). *See Kenney v. M2 Worldwide, LLC*, Civ. No. 12-1059 (SRC), 2013 WL 3508564, at *1 (D.N.J. July 11, 2013)

---

[2] Upon information and belief, Cornerstone had no employees.

(quoting *Saltiel v. GSI Consultants, Inc.*, 788 A.2d 268, 272 (N.J. 2002)).  At this stage of the proceeding, Plaintiffs have plausibly alleged that Mr. Jaffa was personally committing the alleged torts.  It was Jack Jaffa who created Cornerstone Quality Care, LLC in 2016.  SAC at ¶ 45.  It was Jack Jaffa who conspired with Joseph Schwartz to have Cornerstone Quality Care, LLC masquerade as the Plaintiffs' employer.  SAC at ¶¶ 4, 51. It was Jack Jaffa who sent salesmen to the various nursing homes to enroll class members in bogus plans of insurance.  SAC at ¶ 48.  It was Jack Jaffa who American Plan Administrators faulted for 1) lying to it, and 2) failing to fund Plaintiffs' insurance plans.  SAC at ¶ 51.  And most importantly, it was Jack Jaffa who pocketed the premiums.  SAC at ¶ 4.

To be sure, even if Plaintiffs are unable to enumerate every date, time and place, Mr. Jaffa is clearly apprised of the allegations against him.  *Grant v. Turner*, 505 Fed. Appx. 107, 112 (3d Cir. Nov. 27, 2012) ("Although Plaintiffs do not allege who, specifically, made misrepresentations to whom in all cases, they include many other details to "inject precision or some measure of substantiation into [their allegations of fraud].").

### 2. Plaintiffs Adequately Plead a Claim of RICO Conspiracy (Count II)

To provide reasonable notice in a case involving conspiracy, a complaint must plausibly suggest that the individual defendant actually joined and participated in the conspiracy.  *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 179 (E.D. Pa. 2011).  This is precisely what Plaintiffs have done.  Mr. Jaffa's involvement in the alleged conspiracy was to form Cornerstone Quality Care and serve as its managing member.  He and Mr. Schwartz then listed this company as Plaintiffs' employer.  This was a lie.  He and Mr. Schwartz then negotiated with, and lied to, the third-party administrator about the funding of the insurance plan.  This is not a close call, which is presumably why Mr. Jaffa devoted a single paragraph in making the argument.

### 3. Plaintiffs Adequately Plead Fraud-based Claims Against Mr. Jaffa under South Dakota Law (Counts III and VI)

Mr. Jaffa seeks to dismiss Plaintiffs' fraud-based claims under South Dakota law, which includes Plaintiffs' claims under the South Dakota Consumer Protection, Deceptive & Unfair Trade Practices law ("SDCPL") and the South Dakota Fraudulent Concealment Law. Mr. Jaffa's argument fails on both claims.

Under the SDCPL, it is a deceptive act or practice to "[k]nowingly and intentionally act, use or employ any deceptive act or practice, fraud, false pretense, false promises or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been misled, deceived or damaged thereby." SDCL § 37-24-6. Further, any person who has been adversely affected by any act or practice declared unlawful under the SDCPL is permitted to bring a civil action for the recovery of actual damages suffered as a result of such act or practice. SDCL § 37-24-31.

Importantly, an employee is a "person" within the purview of the SDCPL and has standing to sue under the act. *See Moss v. Guttormson*, 551 N.W.2d 14, 17 (S.D. 1996). As the South Dakota Supreme Court held in *Moss*, the SDCPL contains "broad statutory language" that "includes more than only consumers" and thus encompasses an employee who has been adversely affected by an unlawful practice. *Id.* at 11. In that case, the Court found that a salesperson could sustain a claim against his employer under the SDCPL after he was adversely affected by his employer's decision to mislabel its products without his knowledge. *Id.* at 15.

Here, Mr. Jaffa summarily argues that Plaintiffs' SAC contains "group pleading allegations" and does not "provide particular information as to statements, courses of conduct or persons involved" and is therefore legally deficient under the SDCPL. Doc. 38-1 at 27. Not true.

As explained above, Mr. Jaffa's accusations of "group-pleading" are meritless. While Plaintiffs' SAC refers, at times, to the Defendants collectively, it specifically details the conduct of the individual Defendants, including Mr. Jaffa.

Indeed, Plaintiffs' SAC specifically alleges that Cornerstone Quality Care, LLC was a fiction created and designed by Mr. Jaffa to siphon class member's premiums directly into his pocket. SAC at ¶ 46. To that end, it was Mr. Jaffa who directed "salesmen" to induce his employees to enroll in bogus insurance plans, it was Jaffa who was notified by the plan administrator that he failed to fund the insurance plan despite promising to do so, and it was Jaffa who pocketed the premiums knowing that these funds were intended to fund the insurance plans. SAC at ¶¶ 48, 51. Further, Jaffa's conduct resulted in actual damages, SAC at ¶¶ 59-60, and is thus actionable under the SDCPL. To be sure, Jaffa's conduct is precisely the type of deceptive, fraudulent, and misleading conduct that the SDCL is intended to guard against.

Mr. Jaffa's motion to dismiss Plaintiffs' claim under the South Dakota fraudulent concealment law fails for the same reasons. To successfully prove a claim for fraudulent concealment, a plaintiff must show: (1) the suppression of a fact by one who is bound to disclose it, or (2) the suppression of a fact by one who gives information of other facts which are likely to mislead for want of communication of that fact. SDCL 20-10-2(3); *see also Milligan v. Waldo*, 2001 S.D. 2, at P10, 620 N.W.2d 377, 379 (S.D. 2001). Again, Plaintiffs have alleged that Jaffa secured his employees enrollment in health insurance and dental plans, deducted monies from their paychecks to fund the plans, yet failed to disclose that the plans were terminated and that they were not actually covered by any health or dental policies. Indeed, Jaffa had knowledge that the plans were terminated due to his failure to pay premiums, despite his "numerous promises" to do so. SAC at ¶ 51. Despite this knowledge, Jaffa failed to disclose this fact to his employees who

9

suffered damages as a result. Suffice it say, these allegations are sufficient to sustain a claim under the South Dakota fraudulent concealment law.

Accordingly, Plaintiffs' SAC alleges a plausible claim under both the SDCPL and South Dakota fraudulent concealment law and Mr. Jaffa's Motion to Dismiss Counts III and VI should be denied.

### 4. Plaintiffs Adequately Plead the Necessary Elements to Sustain a Claim Under the Kansas Consumer Protection Act (Count IV)

The Kansas Consumer Protection Act ("KCPA") provides that "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction." K.S.A. 50-626(a). Thus, to prevail on a claim under the KCPA, a plaintiff must prove: "(1) plaintiffs were consumers under the KCPA, (2) defendants were suppliers under the KCPA, (3) defendants engaged in a deceptive or unconscionable act or practice in violation of K.S.A. § 50-626 . . . or K.S.A. § 50-627, and (4) plaintiffs were 'aggrieved by such act." *In re Motor Fuel Temperature Sales Practices*, 279 F.R.D. 598, 604-05 (D. Kan. 2012). The KCPA provides the following definitions, which are pertinent here:

- "Consumer" means an individual, husband and wife, sole proprietor, or family partnership who seeks or acquires property or services for personal, family, household, business or agricultural purposes.

- "Consumer transaction" means a sale, lease, assignment or other disposition for value of property or services within this state, except insurance contracts regulated under state law, to a consumer; or a solicitation by a supplier with respect to any of these dispositions.

- "Supplier" means a manufacturer, distributor, dealer, seller, lessor, assignor, or other person who, in the ordinary course of business, solicits, engages in or enforces consumer transactions, whether or not dealing directly with the consumer.

K.S.A. 50-624(b), (c), and (i). Though the KCPA does not define "aggrieved," courts have held that to be "aggrieved" under the statute, a consumer must prove that the seller's act adversely

affected their legal rights and that there was a causal connection between the deceptive act and the claimed injury. *See e.g.*, *Hernandez v. Pistotnik*, 58 Kan. App. 2d 501, 507, 472 P.3d 110 (Kan. 2020). There is no requirement, however, that a consumer be misled by the deceptive act to claim relief under the statute. *Schneider v. Liberty Asset Mgmt.*, 45 Kan. App. 2d 978, 983, 251 P.3d 666, 670 (Kan. 2011).

Here, Mr. Jaffa seeks to have Plaintiffs' claim under the KCPA dismissed on the basis that that Plaintiffs are not "consumers" and he is not a "supplier" under the act. Mr. Jaffa further argues that Plaintiffs fail to allege an "unconscionable act or practice" or that they suffered any damages because of representations made by Mr. Jaffa concerning insurance premiums. Mr. Jaffa's arguments fail on all accounts.

As a preliminary matter, there is nothing to suggest that an employee cannot constitute a "consumer" under the KCPA. A consumer is defined under the KCPA as an individual who seeks or acquires property or services for personal, family, or household services. In this case, regardless of whether Plaintiffs were employees, they were still individuals seeking to acquire property and services in the form of insurance coverage. Further, Mr. Jaffa must be considered a "supplier" under the act insofar as he is a person who, in the ordinary course of business, solicited, engaged in, and enforced consumer transactions by soliciting his employees enrollment in health and dental plans he never intended to fund.

Plaintiffs have further alleged sufficient facts to establish that they were aggrieved by an "unconscionable act or practice." More specifically, Plaintiffs have alleged that Mr. Jaffa and his fictious company, Cornerstone Quality Care LLC, continued to deduct monies from Plaintiffs' paychecks without ever actually funding the plans. SAC at ¶ 49. In other words, Mr. Jaffa withheld monies from the staff members paychecks for his own personal gain, while continuing to

11

falsely and deceptively indicate on their paystubs that these funds were used to pay their premiums and fund their insurance plans. SAC at ¶ 52. The staff members relied upon these misrepresentations to their detriment and underwent medical and dental procedures, only to later discover that their plans had been terminated and their procedures not covered. SAC at ¶ 54. Moreover, even if Mr. Jaffa did not directly engage with the Plaintiffs regarding the insurance premiums, that does not obviate him from liability under the KCPA. Indeed, the KCPA specifically states that a "supplier" need not deal directly with the consumer. K.S.A. 50-624(i).

Accordingly, Plaintiffs have alleged sufficient facts to establish a claim under the KCPA and Mr. Jaffa's Motion to Dismiss Count IV should be denied.

### 5. Plaintiffs Adequately Plead the Necessary Elements of the Nebraska Consumer Protection Act (Count V)

The Nebraska Consumer Protection Act ("CPA") proscribes "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" and allows injured individuals a private right of action. Neb. Rev. Stat. Ann §§ 59-1602-1609. The CPA defines "[t]rade and commerce" to mean "the sale of assets or services and any commerce directly or indirectly affecting the people of the State of Nebraska." Neb. Rev. Stat. § 59-1601(2). Accordingly, the CPA applies to any "unfair or deceptive practices which affect the 'public interest.'" *Eicher v. Mid Am. Fin. Inv. Corp.*, 275 Neb. 462, 473, 748 N.W.2d 1, 12 (Neb. 2008).

Mr. Jaffa argues that Plaintiffs' claim under the CPA must be dismissed on the basis that Plaintiffs do not allege any impact on the consumers of Nebraska at large. In support of their argument, Mr. Jaffa relies upon the Nebraska District Court's decision in *Ordosgiotti v. Werner Enterprises, Inc.*, 8:20-CV-421, 2021 WL 826504 (D. Neb. March 4, 2021). There, the plaintiff who worked as a truck driver for the defendants, alleged that they violated the CPA by misleading

potential drivers about the profitability of the leasing and operating agreements presented to them. *Id.* at *16. The court ultimately dismissed the plaintiff's claim under the CPA, concluding that plaintiff failed to adequately plead that the allegedly deceptive conduct impacted the general public. *Id.* at *19.

In reaching its conclusion, the court in *Ordosgiotti* relied upon the Supreme Court of Nebraska's decision in *Nelson v. Lusterstone Surfacing Co.*, 258 Neb. 678, 684, 605 N.W.2d 136, 142 (Neb. 2000). In that case, the court was tasked with determining whether an isolated sale of a vehicle between two private parties fell within the ambit of the CPA. The court in *Nelson* determined that it did not, because the CPA does not apply to "isolated transactions between individuals that do not have an impact on consumers at large." *Id.*

While Plaintiffs acknowledge that the CPA does not apply to isolated transactions between private individuals, that is not what is alleged here. Indeed, the allegations here are not even remotely close to a case like *Nelson*, which involved a single isolated transaction with no significant impact outside of the two private parties involved. On the contrary, Plaintiffs have alleged a fraudulent and deceptive scheme to defraud potentially thousands of Nebraskan citizens employed across 19 different nursing facilities in Nebraska. To conclude that this conduct amounts to a "isolated transaction," when thousands of Nebraskans had money deducted from their paychecks in exchange for insurance coverage that was never ultimately procured would render the CPA meaningless.

Accordingly, Plaintiffs has alleged sufficient facts to establish a claim under the CPA and Mr. Jaffa's Motion to Dismiss Count V should be denied.

### 6. Plaintiffs Adequately Plead the Necessary Elements to Sustain a Claim Under the Arkansas Deceptive Trade Practices Act (Count VII)

The Arkansas Deceptive Trade Practices Act ("ADTPA") grants a right of recovery to any person who suffers actual damages or injury resulting from a violation of the act. A.C.A. § 4-88-113(f).[3] The ADTPA specifically enumerates certain deceptive acts or prohibited trade practices, but also includes a catch-all provision that prohibits "[e]ngaging in any other "unconscionable, false, or deceptive act or practice in business, commerce, or trade." A.C.A. § 4-88-107(a)(10); *see also Valor Healthcare, Inc. v. Pinkerton*, No. 08-6015, 2008 U.S. Dist. LEXIS 105988, at *7 (W.D. Ark. Dec. 23, 2008) (discussing who has standing to bring a claim under the ADTPA). Accordingly, the Arkansas Supreme Court has stated that a plaintiff pursuing a claim under the ADTPA must establish (1) a deceptive consumer-oriented act or practice which is misleading in a material respect, and (2) injury resulting from such act." *Skalla v. Canepari*, 2013 Ark. 415, 14, 430 S.W.3d 72, 82 (Ark. 2013) (citing Ark. Code Ann. § 4-88-113(f)).

Here, Mr. Jaffa generally argues that Plaintiffs have failed to allege any facts demonstrating Jaffa's knowledge and purposeful concealment of any alleged scheme. To be clear, Plaintiffs are permitted under Rule 9(b) to plead conditions of the mind, including knowledge, generally. To that end, Plaintiffs have alleged that Mr. Jaffa conspired to withhold staff members insurance premiums for his personal gain, while misrepresenting to said staff members that such premiums were being paid by deceptively and falsely indicating as much on their paystubs. SAC ¶ 52. Moreover, it is apparent from the allegations that Mr. Jaffa did, in fact, have actual knowledge and purposely concealed the alleged scheme as evidenced by the March 29, 2018 termination letter

---

[3] Plaintiffs acknowledge that the ADTPA was amended in 2017 to prohibit enforcement through a private class action and thus concede that this claim can only proceed on an individual basis. A.C.A. § 4-88-113(f)(1)(B).

from the plan administrator. As of this date, Mr. Jaffa personally knew that the plans were not funded and were being terminated. SAC at ¶ 51. As also indicated in the termination letter, Mr. Jaffa had "several meetings" with the plan administrator and had made "numerous promises" to fund the claims in a timely manner, but failed to do so unbeknownst to his employees. *Id.* As a result of Jaffa's scheme and concealment of the same, class members proceeded to undergo medical and dental procedures under the mistaken belief that these procedures would be covered by their insurance. SAC ¶ 54. Needless to say, these are precisely the types of unconscionable, false, and deceptive acts prohibited and actionable under the ADTPA.

Accordingly, Plaintiffs' SAC pleads all necessary elements to sustain a claim under the ADTPA and Mr. Jaffa's Motion to Dismiss Count VII should be denied.

### 7. **Plaintiffs Adequately Plead the Breach of Fiduciary Duty Claim (Count VIII)**

Mr. Jaffa summarily asserts that Plaintiffs fail to plead the elements of a breach of fiduciary duty claim. His assertion is incorrect. Mr. Jaffa concedes that all of the potentially relevant jurisdictions require the same elements to maintain a breach of fiduciary duty claim: (1) a fiduciary relationship between the plaintiff and defendant; (2) a breach of that duty by the defendant; and (3) that damages were suffered as a result. (Doc. 38-1, p. 34). The SAC pleads each of these elements.

Plaintiffs allege that Defendants owed them a fiduciary duty regarding the subject matter of this case by individually and voluntarily fostering and forging a relationship of special confidence with the Plaintiffs, marked by the Defendants' superior knowledge, skill and abilities. This gave rise to a gross disparity of power and bargaining position in relation to the Defendants' employee-Plaintiffs, who placed special confidence and trust in the Defendants and Mr. Jaffa with regard to the promised procurement of dental and health insurance. SAC at ¶¶129-131. These

facts reveal a special relationship between the Plaintiffs and Mr. Jaffa that required fidelity, loyalty, good faith and fair dealing. SAC at ¶132. By falsely promising to procure health and dental insurance for the Plaintiffs, Defendants and Mr. Jaffa intentionally deceived the Plaintiffs, breached their fiduciary duties arising from their special relationship, and caused the Plaintiff's financial harm.  SAC at ¶¶133-135.

Based on the above, Mr. Jaffa's effortless denial that the SAC pleads the elements of a breach of fiduciary duty claim is not enough. Mr. Jaffa advances no argument that a fiduciary duty could not exist and be breached as a matter of law. Indeed, he articulates no legal basis for rejection of a breach of fiduciary duty claim based on the facts alleged in this case. In short, Mr. Jaffa's motion in this regard lacks any substance and should be rejected

### 8. **Plaintiffs Adequately Plead the Negligence Claim (Count IX)**

Mr. Jaffa's motion to dismiss the negligence count similarly concludes that Plaintiffs have not pleaded the elements of a negligence claim. He is mistaken again.  Like above, Mr. Jaffa concedes that all of the potentially relevant jurisdictions require the same elements to maintain a negligence claim: (1) the defendant owes a legal duty to the plaintiff; (2) the defendant breached that duty; (3) the plaintiff suffered injury and (4) the defendant's breach caused that injury. (Doc. 38-1, p. 37). The SAC, when read as a whole, clearly pleads these elements.

Nevertheless, under Rule 8, "Plaintiffs are not required to plead each element of their [negligence] claim with specificity[]" – all that is required is "a short and plain statement of the claim that gives defendants notice of the nature of the claim and the grounds upon which it rests." *See Klump v. Nazareth Area Sch. Dist.*, 425 F. Supp. 2d 622, 642-43 (E.D. Pa. 2006) (concluding that "we will not dismiss plaintiffs' negligence claim for failing to set out the requisite elements[] [and] [t]he details can be fleshed out in discovery.") (internal citations and quotations omitted)).

Plaintiffs have certainly provided enough detail at this stage; alleging that the Mr. Jaffa exercised complete control over the payroll deductions meant for Plaintiffs' health and dental insurance premiums, and the destination of those sums, and knew or should have known said deductions were not being used to pay premiums for the Plaintiffs' dental and health insurance. SAC at ¶¶ 136-137. The proximate result of these failures was harm to the Plaintiffs. SAC at ¶ 138.

This level of detail suffices at this stage of the litigation. Moreover, as set forth above, Mr. Jaffa's intentional tortious conduct is pleaded in detail throughout the SAC and such detailed conduct is relevant and supportive of a negligence claim. "On this point, the Third Circuit has said that 'intentional or reckless behavior is often relevant to showing conduct below the reasonable standard of care necessary to make out a case of negligence.'" *Id.* at 643 (quoting *In re Diet Drugs*, 369 F.3d 292, 312 (3d Cir. 2004)). Accordingly, Plaintiffs' negligence claim should proceed.

### 9. Plaintiffs Adequately Plead the Conversion Claim (Count X)

Mr. Jaffa moves to dismiss Plaintiffs' conversion claim with the similar terse denial that the SAC pleads the elements of conversion. Further, Mr. Jaffa argues that a conversion claim typically cannot stand when money is the property converted, as alleged here. Mr. Jaffa's motion should be denied on both grounds.

Like the other common law claims, Mr. Jaffa concedes the elements of conversion are substantially the same across the potentially applicable jurisdictions—requiring the defendant to wrongfully commit a distinct act of dominion over the property of another, which is a denial of or inconsistent with the owners' rights. (Doc. 38-1, pp. 35-36). The SAC details Mr. Jaffa's involvement in the unlawful theft of the Plaintiffs' money—the ultimate act of dominion over the property of another that denies the owners' rights in that property. The money that was stolen was not illusory future profits, but readily identifiable dollars deducted from the Plaintiff's paychecks

and allocated for a specific purpose. Contrary to Mr. Jaffa's bare assertions, Paragraph 49 of the SAC alleges the specific and identifiable money at issue. Those amounts were earmarked for a specific purpose and those amounts were converted to the Defendants' own purposes, including Mr. Jaffa's. Paragraph 52 of the SAC similarly alleges that the converted money was readily identifiable and the amounts stolen identified on each employees' paystubs.

These allegations are material for the tort of conversion, in that "the law draws a line, if a somewhat arbitrary one, between a claim that one is owed money, and a claim that a particular pot of money was taken or wrongfully diverted to the defendant's own use." *Dougherty v. Drew Univ.*, No. 21-00249 (KM) (ESK), 2021 U.S. Dist. LEXIS 73138, at *24-25 (D.N.J. Apr. 14, 2021). Where, as here, the claim of conversion relates to a particular pot of money that was unlawfully diverted, it can proceed. *Id.* And Mr. Jaffa's role as an officer or director of any entities involved in the conversion will not shield him from liability. *See Glenfed Fin. Corp., Commercial Fin. Div. v. Penick Corp.*, 276 N.J. Super. 163, 181, (App. Div. 1994) (holding "It is well settled that the officers of a corporation are personally liable to one whose money or property has been misappropriated or converted by them to the uses of the corporation, although they derived no personal benefit therefrom and acted merely as agents of the corporation." (quoting *Hirsch v. Phily*, 4 N.J. 408, 416, 73 A.2d 173 (1950)). Here of course, Mr. Jaffa as the sole member and managing member of Cornerstone was the only individual benefitting from this scheme.

**III.   CONCLUSION**

In light of the above arguments, and the specificity of the averments in Plaintiffs' SAC, it is respectfully requested that this Honorable Court enter the attached Proposed Order Denying Defendant Jack Jaffa's Motion to Dismiss in its entirety.

                Respectfully submitted,

Dated:  November 24, 2021       /s/  *Matthew T. Stone*
                Matthew T. Stone, Esquire
                NJ ID No.  014882007
                MURRAY, STONE & WILSON, PLLC
                One Belmont Avenue, Suite 310
                Bala Cynwyd, Pennsylvania 19004
                215-947-5300 (Phone); 813-251-2209 (Fax)
                Email:  mstone@mswlawgroup.com
                *Attorneys for Plaintiffs*