**Not for Publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| THERESA DANTE; TED HUSS; JULIET HINRICHS; SAMANTHA OGGS; and MARGARET GATES, | Civil Action No. 20-01047 |
| *Plaintiffs,* | |
| v. | **OPINION** |
| JOSEPH SCHWARTZ; ROSIE SCHWARTZ; SKYLINE HEALTH CARE, LLC; SKYLINE MANAGEMENT GROUP, LLC; CORNERSTONE QUALITY CARE, LLC; COTTONWOOD HEALTHCARE, LLC; FIRST LANDING INFORMATION SERVICES, LLC; and JACK JAFFA a/k/a CHAVA JAFFA, | |
| *Defendants.* | |

**John Michael Vazquez, U.S.D.J.**

In this putative class action, Plaintiffs claim that they paid for insurance coverage, but Defendants stole the money, leaving Plaintiffs without coverage. Currently before the Court is the motion of Defendant Jack Jaffa ("Defendant" or "Jaffa") to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6), Plaintiffs' Second Amended Complaint. D.E. 38. The Court has reviewed the parties' submissions[1] and decided the motion without oral argument pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 78.1(b). For the reasons set forth below, Defendant's motion is **GRANTED in part and DENIED in part**.

---

[1] Defendant's brief in support of the motion, D.E. 38-1, will be referred to as "D. Br." Plaintiffs' brief in opposition, D.E. 41, will be referred to as "Opp'n." Defendant's reply to the opposition, D.E. 42, will be referred to as "D. Reply."

## I.      BACKGROUND

Plaintiffs worked at nursing homes in Georgia, South Dakota, Kansas, Arkansas, and Nebraska.  D.E. 33 ("SAC") ¶¶ 7-11.  The nursing homes were owned by Defendant Skyline Healthcare, LLC ("Skyline"), whose sole members were Joseph Schwartz and his wife Rosie Schwartz.  *Id.* ¶¶ 30-31.  Skyline was founded in 2008 to manage nursing homes in New Jersey and Pennsylvania.  *Id.*  As of 2017, Skyline owned over 100 nursing homes in several states, with major expansion occurring from 2015 to 2017.  *Id.* ¶ 31.  To facilitate this growth, the Schwartzes formed several LLCs, including Defendants Skyline Management Group, Cottonwood Healthcare, and First Landing Information Services.  *See id.* ¶¶ 12, 14, 16-17.  Plaintiffs allege that the Schwartzes grew their holdings quickly, siphoned off the revenue, and then divested themselves of the facilities.  *Id.* ¶ 43.

On December 13, 2016, Defendant Jack Jaffa formed Defendant Cornerstone Quality Care, LLC ("Cornerstone"), as its sole member.  *Id.* ¶¶ 15, 18, 33, 45.  Cornerstone's official address is 4581 Route 9, Site 100, Howell, N.J. 07731.  *Id.* ¶ 47.  Cornerstone was the employer-of-record for Skyline's staff members, including Plaintiffs, and Plaintiffs' W2 and 1095 tax forms list Cornerstone as the employer.  *Id.* ¶¶ 7-11, 33, 46, 55.  Plaintiffs' 1095 forms, however, listed Cornerstone's address as 40 Vreeland Avenue, Totowa, N.J. 07512, which is the registered address of Joseph Schwartz's companies.  *Id.* ¶ 47.  Plaintiffs had no other familiarity with Cornerstone. *Id.* ¶ 46.

Defendants offered Plaintiffs and other employees health, dental, and supplemental insurance.  *Id.* ¶¶ 44, 48.  Jaffa sent unnamed salespersons to Skyline's facilities, and the salespersons represented to the employees that the employees could participate in an insurance plan, with Defendants taking the premium amount directly from employees' paychecks.  *See id.*

¶¶ 44, 48-49.  Employees signed up and premium amounts were withheld from their paychecks. *See id.* ¶¶ 48-49.

Defendants retained American Plan Administrators as a third-party administrator. *Id.* ¶ 51. However, insurance was never provided to the employees, and Defendants did not fund the insurance plan. *Id.* ¶¶ 49, 51. On March 29, 2018, American Plan Administrators sent a termination letter to Joseph Schwartz and Jaffa, indicating that

> you have not been paying your claims in a timely manner and we had several meetings at which you made us numerous promises that you will fund your claims timely. To date you have not kept up to these promises and we now have substantial outstanding balances. We are getting hammered from providers and members about open claims that have not been paid.

*Id.* ¶ 51. Later, Tall Tree Administrators was retained as a third-party administrator. *Id.* ¶ 53. Tall Tree Administrators encountered the same issues as American Plan Administrators, indicating that "[t]he self-funded employer group, Skyline Healthcare, has failed to provide Tall Tree with any funding for their employee claims. After multiple attempts, it appears that the funding for claims will not occur, and therefore Tall Tree has terminated our services on behalf of Skyline Healthcare." *Id.* Plaintiffs were unaware that the insurance plans had not been funded and, as a result, received medical and dental care for which they were (unknowingly) responsible financially. *Id.* ¶¶ 54-68.[2]

By 2018 or 2019, Skyline began to divest itself of recently acquired nursing homes. *Id.* ¶ 43. Over fifty of Skyline's facilities have gone into state-run receiverships because of non-payment of bills. *Id.* ¶¶ 38, 41. Plaintiffs allege that the formation of Cornerstone and the

---

[2] While this matter focuses on the lack of insurance coverage that Plaintiffs paid for, Plaintiffs also indicate that the Schwartzes, through Skyline, grossly under-capitalized the nursing homes, leading to employee benefits being cut and vendors' bills being unpaid. *Id.* ¶ 36.

nonpayment of insurance costs were part a larger conspiracy between Joseph Schwartz and Jaffa to pocket those sums and run the facilities solely for their benefit. *See id.* ¶¶ 4, 52. Plaintiffs refer to the Defendants collectively as "the Skyline Enterprise" and allege that the constituent entities were formed to improperly further Defendants' personal interests. *See id.* ¶¶ 20-29.

Plaintiffs filed their first Complaint on January 30, 2020. D.E. 1. Plaintiffs amended their Complaint on October 21, 2020, to, *inter alia*, add Jaffa as a defendant. D.E. 21. Plaintiffs then filed the SAC on August 17, 2021. D.E. 33. The SAC asserts one, overarching class and several subclasses based on the state in which Plaintiffs worked. *See* SAC ¶¶ 82-127. The overarching class brings claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, (Count I); conspiracy to violate RICO, 18 U.S.C. § 1962(d), (Count II); and breach of fiduciary duty, (Count VIII); negligence, (Count IX); and conversion (Count X). *Id.* ¶¶ 91-95, 128-42. Plaintiffs also assert four subclasses: (1) a South-Dakota class pursuant to the South Dakota Consumer Protection Law ("SDCPL"), S.D. Codified Laws § 37-24-1 *et seq.*, (Count III); and the South Dakota Fraudulent Concealment Law ("SDFCL"), S.D. Codified Laws § 20-10-2(3), (Count VI); (2) a Kansas class under the Kansas Consumer Protection Act ("KCPA"), Kan. Stat. Ann. § 50-623 *et seq.*, (Count IV); (3) a Nebraska class under the Nebraska Consumer Protection Act ("NCPA"), Neb. Rev. Stat. § 59-1061 *et seq.*, (Count V); and (4) an Arkansas class, under the Arkansas Deceptive Trade Practices Act ("ADTPA"), Ark. Code Ann. § 4-88-107 *et seq.*, (Count VII).

Jaffa moved to dismiss all counts brought against him individually. D.E. 38.

4

## II.      STANDARD OF REVIEW

To withstand a motion to dismiss under Rule 12(b)(6), a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A complaint is plausible on its face when there is enough factual content "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Although the plausibility standard "does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations omitted).  As a result, a plaintiff must "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of [his] claims." *Id.* at 789.

In evaluating the sufficiency of a complaint, a district court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).  A court, however, is "not compelled to accept unwarranted inferences, unsupported conclusions or legal conclusions disguised as factual allegations." *Baraka v. McGreevey*, 481 F.3d 187, 211 (3d Cir. 2007).  If, after viewing the allegations in the complaint most favorable to the plaintiff, it appears that no relief could be granted under any set of facts consistent with the allegations, a court may dismiss the complaint for failure to state a claim. *DeFazio v. Leading Edge Recovery Sols., LLC*, No. 10-2945, 2010 WL 5146765, at *1 (D.N.J. Dec. 13, 2010).

"Independent of the standard applicable to Rule 12(b)(6) motions, Rule 9(b) imposes a heightened pleading requirement of factual particularity with respect to allegations of fraud." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.,* 311 F.3d 198, 216 (3d Cir. 2002).  Thus, pursuant to

Rule 9(b), when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  A party alleging fraud must therefore support its allegations with factual details such as "the who, what, when, where and how of the events at issue."  *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016).  Accordingly, "[t]o satisfy the particularity standard, 'the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation.'"  *Feingold v. Graff*, 516 F. App'x 223, 226 (3d Cir. 2013) (citing *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007)).  This heightened pleading standard is designed to "ensure that defendants are placed on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of fraud."  *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989) (internal quotation marks omitted).

### III. ANALYSIS

#### A. Group Pleading and Rule 9(b)

Defendant first argues that Plaintiffs have failed to set forth sufficient specific facts against him.  D. Br. at 3-12.  Defendant explains that Plaintiffs have engaged in impermissible group pleading and that the SAC fails to meet Rule 9(b).  *Id.*  The Court addresses each in turn.

"Even under the most liberal notice pleading requirements of Rule 8(a), a plaintiff must differentiate between defendants."  *Shaw v. Hous. Auth. of Camden*, No. 11-4291, 2012 WL 3283402, at *2 (D.N.J. Aug. 10, 2012).  Mere "conclusory allegations against defendants as a group" that "fail[] to allege the personal involvement of any defendant" are insufficient to state a claim.  *Galicki v. New Jersey*, No. 14-169, 2015 WL 3970297, at *2 (D.N.J. June 29, 2015).  A

plaintiff must allege facts that "establish each individual [d]efendant's liability for the misconduct alleged." *Id.* Group pleading fails to meet the plausibility requirement. *See e.g., Sheeran v. Blyth Shipholding S.A.*, No. 14-5482, 2015 WL 9048979, at *3 (D.N.J. Dec. 16, 2015); *see also Ingris v. Borough of Caldwell*, No. 14-855, 2015 WL 3613499, at *5 (D.N.J. June 9, 2015) ("[T]o the extent Plaintiff seeks to lump several defendants together without setting forth what each particular defendant is alleged to have done, he has engaged in impermissibly vague group pleading.").

Defendant extensively quotes *Sheeran* in support of his argument. D. Br. at 6-7. In that case, the plaintiff was injured while working on a ship and sued eight businesses, four of whom were later dismissed from the case. 2015 WL 9048979, at *1. The complaint, however, failed to specify the roles played by each defendant. *Id.* at *1. Instead, it merely indicated that all the defendants "owned, leased, operated, managed, possessed and/or controlled" the ship. *Id.* (internal citation omitted). The complaint also did not identify the legal duty or duties that each defendant owed to the plaintiff and did not identify how each defendant acted negligently. *Id.* at *2. The court dismissed the negligence claim, deeming the complaint an exercise in group pleading. *Id.* at **3-5. The court emphasized that the complaint did not satisfy Rule 8 of the Federal Rules of Civil Procedure "because the allegations do not inform each Defendant of the particular claims against it." *Id.* at *4.

Jaffa is correct that the SAC often lumps all Defendants together when making allegations. For example, the SAC alleges that "[a]ll Defendant comprise the 'Skyline Enterprise.'" SAC ¶ 19. An enterprise, as is discussed below, is a necessary element of a RICO claim. Thus, merely referring to all Defendant as part of an enterprise, without supporting allegations, is insufficient to create a reasonable inference of an enterprise. Likewise, the SAC often refers to Defendants

7

collectively, either as "Defendants" or as the "Skyline Enterprise."  *See, e.g.*, *id.* ¶¶ 44, 54, 83-85, 87, 89, 92-93, 95, 97-98.

The specific allegations as to Jaffa include the following:  (1) Joseph Schwartz selected Jaffa and Cornerstone "to be in charge of insurance coverage for the staff members at the . . . nursing facilities[,]" *id.* ¶ 24; (2) while the Schwartzes, through Skyline, were expanding their nursing home purchases, Jaffa formed Cornerstone in 2016 to serve as the employer for the nursing homes' staff, *id.* ¶ 33; (3) Jaffa, as the managing member of Cornerstone, "conspired" with Joseph Schwartz to have Cornerstone serve as the employer, *id.* ¶ 45; (4) Jaffa sent "salesmen" to each facility to enroll every employee in Skyline's insurance plans, *id.* ¶ 48; (5) Jaffa (along with Joseph Schwartz) received the March 29, 2018 termination letter from American Plan Administrators, *id.* ¶ 51, and (6) in 2017 and 2018, Joseph Schwartz and Jaffa "conspired to withhold staff members' health insurance premiums for personal gain while misrepresenting to said staff members that such premiums were being paid by deceptively and false indicating the same on their paystubs." *Id.* ¶ 52.  Certain of these allegations are not entitled to the presumption of truth, such as the conclusory word "conspiracy."  The Court would have expected more specifics as to information that Plaintiffs apparently possess, such as to the salespersons enrolling employees in the plans (for example, as to the interactions with the salespersons, who the salespersons indicated they were acting on behalf of, what the salespersons promised, and what agreements were reached).

However, the Court cannot overlook the fact that Plaintiffs contend that the entire insurance program was a complete scam.  *Id.* ¶¶ 48, 49.  Plaintiffs permitted premium payments to be deducted from their paychecks but "*no insurance was ever procured*."  *Id.* ¶ 49 (emphasis in original).  And Jaffa does not attack these allegations.  Similarly, Plaintiffs allege that they were not told that they were employees of Cornerstone.  Jaffa does not contest this assertion, either.

8

Thus, this is not a case in which some insurance was provided, or insurance coverage lapsed; instead, Plaintiffs contend that they never had insurance coverage, nor did they know by whom they were purportedly employed.  In light of these overarching allegations, Plaintiffs sufficiently plead Jaffa's involvement.  Plaintiffs plausibly plead the date that Cornerstone began, that Jaffa was its sole member, that Cornerstone was the purported employer on their Form 1095-Cs, that Cornerstone never provided any insurance coverage, that Cornerstone indicated that it was responsible for the paycheck withdrawals, that Cornerstone used different addresses (and that one was bogus), and that the March 29, 2018 termination letter from American Plan Administrators was addressed to Jafa (and Joseph Schwartz).  And the termination later references prior conversation and promises made by Jafa that were not kept.  In short, Plaintiffs adequately alleged that Cornerstone, and Jaffa as its sole member, were key cogs in the fraud scheme.  The Court finds that the SAC has sufficiently pled Jaffa's individual involvement and is not barred by the prohibition on group pleading.

Turning to the Rule 9(b) argument, the parties agree that the first seven counts of the SAC are subject to the rule.  D. Br. at 8; Opp'n at 4.  Defendant appears to raise two arguments (in addition to the group pleading, discussed above) as to why Plaintiffs have failed to satisfy Rule 9: Plaintiffs impermissibly attribute corporate action to Defendant, and Plaintiffs have failed to provide the detail required by Rule 9(b).  Def. Br. at 9-11.

As to Defendant's argument regarding the imputation of company action to Jaffa, Plaintiffs cite this Court's decision in *United Capital Funding Group, LLC v. Brick City Brewing, LLC*, for the proposition that a member of an LLC may be held personally responsible for an LLC's tort when he participates, to a sufficient degree, in the commission of that tort.  Opp'n at 6 (quoting No. 21-3314, 2021 WL 5150197, at *3 (D.N.J. Nov. 4, 2021)).

In that case, the plaintiff, United Capital, sued both Brick City Brewing and one of that LLC's members, Stephen Hughes. 2021 WL 5150197, at *1. Hughes signed invoices on behalf of Brick City Brewing. *Id.* United Capital claimed that Brick City had not paid invoices. *Id.* United Capital sued Hughes personally for negligent misrepresentation and common-law fraud. *Id.* Construing the New Jersey Limited Liability Company Act, the Court explained that limited liability for members of an LLC is the norm, and "that 'the mere act of facilitating a contract on behalf of a principal's limited liability company does not create personal liability for the principal himself.'" *Id.* at *3 (quoting *U.S. Land Res., LP v. JDI Realty LLC*, No. 08-5162, 2010 WL 3218417, at *5 (D.N.J. Aug. 12, 2010)). However, the Court acknowledged that "an LLC member can be held personally liable for a tort committed by the LLC 'when he or she is sufficiently involved in the commission of the tort.'" *Id.* (quoting *Kenney v. M2 Worldwide, LLC*, No. 12-1059, 2013 WL 3508564, at *1 (D.N.J. July 11, 2013)). The Court, quoting the New Jersey Supreme Court, referred to this as "the participation theory of tort liability[.]" *Id.* (quoting *Saltiel v. GSI Consultants, Inc*., 788 A.2d 268, 275-76 (N.J. 2002)). The Court found that the complaint had not stated a claim against Hughes as to his participation in any fraud perpetrated by Brick City Brewing. *Id.* at *5. The Court therefore granted Hughes's motion to dismiss the fraud claim against him personally. *Id.* at **5-6.

Here, the SAC casts Jaffa as an active participant in that that Jaffa formed Cornerstone and caused salespersons to go to Skyline's facilities to enroll Plaintiffs in the bogus insurance plans. The SAC further alleges that Jaffa personally, along with Joseph Schwartz, reaped the rewards. Finally, the March 29, 2018 termination letter from American Plan Administrators was addressed to Jaffa. Accordingly, the Court finds that Plaintiffs have sufficiently pled Jaffa's personal participation.

Defendant also argues that the SAC lacks the particularity required by Rule 9(b).  D. Br. at 9, 11-12.  Plaintiffs respond that they have met the requisite standard and rely on *Grant v. Turner*, 505 F. App'x 107, 112 (3d Cir. 2012).  Opp'n at 7.  *Grant* also involved a putative class action. 505 F. App'x at 109.  The class brought claims against two groups of defendants, which the Third Circuit referred to as the Travel Club Defendants and the Credit Card Defendants.  *Id.*  The Travel Club Defendants allegedly created false travel clubs, which purported to offer substantial and exclusive discounts for travel services in exchange for membership dues, and induced plaintiffs to buy memberships in the nonexistent clubs.  *Id.*  The Credit Card Defendants then "provided 'point of sale' financing" for the costs of membership, which had the incidental effect of lending an air of legitimacy to the Travel Club Defendants' operations.  *Id.*

The plaintiffs did not receive the benefits they paid for and brought RICO claims against the defendants.  *Id.* at 109.  The district court granted the defendants' motion to dismiss.  *Id.* at 110.  Faulting the plaintiffs for lumping the defendants together and accusing them of identical misconduct, the lower court observed that the plaintiffs had not specified the dates on which they received the initial mailings, when they telephoned defendants, when or where the defendants held the presentations, or when the plaintiffs unsuccessfully tried to use the benefits the plaintiffs thought they had bought.  *Id.*  The plaintiffs amended the complaint, adding further detail and attaching as exhibits contracts produced by the Travel Club Defendants.  *Id.*  In response to a renewed motion, the district court again found that the plaintiffs had not adequately pled the applicable predicate acts for a RICO case.  *Id.*

The Third Circuit found that the plaintiffs had not adequately pled claims against the Credit Card Defendants but that they had sufficiently pled claims against the Travel Club Defendants.  *Id.* at 111-12.  The Third Circuit agreed that the amended complaint had failed to specify the role each

11

of the Credit Card Defendants played. *Id.* at 112. The *Grant* court found that whether the complaint stated a claim against the Travel Club Defendants presented a close call because the complaint did not specify who made misrepresentations. *Id.* But the court in *Grant* observed that the plaintiffs had otherwise substantiated their complaint and added meaningful precision by providing other corroborating detail. *Id.* Accordingly, the Circuit concluded that the plaintiffs put the Travel Club Defendants "on notice of the precise misconduct with which they [were] charged." *Id.* (alteration in original) (quoting *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984)). The Third Circuit noted that without discovery, the plaintiffs could not allege precisely who made misrepresentations because the Travel Club Defendants allegedly "deliberately concealed the identities of salespeople and agents." *Grant*, 505 F. App'x at 112.

The Court finds that Plaintiffs have provided enough detail to put Defendant on notice of the precise misconduct that forms the basis of Plaintiffs' claims. Again, the Court cannot overlook the fact that Plaintiffs plead an overarching scheme to defraud (the phony insurance plans) with Cornerstone at the center of scheme as Plaintiffs' purported employer. And, again, Jaffa does not challenge these allegations. The SAC alleges an agreement or conspiracy between Defendant and Joseph Schwartz; accuses Defendant of forming Cornerstone (as its sole member) in furtherance of the conspiracy; accuses Jaffa of soliciting membership in an employee insurance plan by dispatching salespersons to Skyline's facilities; accuses Cornerstone of deducting premiums from Plaintiffs' paychecks; and accuses Cornerstone of not acquiring insurance, with one letter from a third-party administrator addressed to Jaffa and Joseph Schwartz.

The Court finds that Plaintiffs have satisfied the requirements of Rule 9(b).

### B. Plaintiffs' Substantive Claims

Next, Defendant argues that the SAC fails to set forth facts to state claims under federal or state law.  The Court considers each in turn.

### 1. RICO and RICO Conspiracy (Counts I & II)

"The civil RICO statute allows '[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter [to] sue therefor in any appropriate United States district court.'"  *Anderson v. Ayling*, 396 F.3d 265, 268-69 (3d Cir. 2005) (quoting 18 U.S.C. § 1964(c)).  To bring a federal civil RICO claim under 18 U.S.C. § 1962(c), a plaintiff must allege "(1) the conducting of, (2) an enterprise, (3) through a pattern, (4) of racketeering activity." *Gunter v. Ridgewood Energy Corp.*, 32 F. Supp. 2d 166, 173 (D.N.J. 1998).  Plaintiffs allege that Defendant committed the predicate acts of mail fraud and wire fraud.  SAC ¶ 86. *Lum v. Bank of Am.*, 361 F.3d 217, 223 (3d Cir. 2004) ("The[] predicate acts of racketeering may include, *inter alia*, federal mail fraud under 18 U.S.C. § 1341 or federal wire fraud under 18 U.S.C. § 1343.").

Jaffa appears to only challenge[3] the first element, that is, whether he "conducted" an enterprise. *See* D. Br. at 14-15.  The Supreme Court has explained that the word "conduct," as used by the statute, "requires an element of direction." *Reeves v. Ernst & Young*, 507 U.S. 170, 178 (1993).  In other words, "'to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs,' § 1962(c), one must participate in the operation or management of the enterprise itself." *Id.* at 185.  Thus, "liability depends on showing that the defendants conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs." *Id.* (emphases in original).

---

[3] Defendant also make a cursory denial of the second element.

Jaffa argues that Plaintiffs' substantive RICO claim fails because Plaintiffs rely on the allegation that Defendant owned the company, Cornerstone, that was involved with Plaintiffs' employment at the nursing homes.  D. Br. at 14.  He asserts that the company's conduct cannot be imputed to him.  *Id.* at 14 & n.4.  The Court finds that the SAC sufficiently pleads a civil RICO claim against Defendant.  For the reasons stated above as to Jaffa's personal involvement, the SAC alleges sufficient "conduct" on Defendant's part.

Defendant next asserts that if Plaintiffs' substantive RICO claim fails, then their conspiracy must fail in turn.  *Id*. at 15.  He further argues that Plaintiffs have failed to allege the existence of a conspiracy, or that he participated in a conspiracy.  *Id.*  The first assertion falls short because the Court has found that the substantive RICO claim is sufficiently alleged.  The second assertion is made in conclusory fashion without analysis, so the Court rejects it.  Accordingly, the Court finds that Plaintiffs have sufficiently stated a claim for RICO conspiracy.

### 2. South Dakota Subclass (Counts III & VI)

### a. The SDCPL (Count III)

Defendant argues that Plaintiffs have failed to state a claim under the SDCPL because they have not sufficiently alleged that he engaged in an act or practice proscribed in S.D. Codified Laws §§ 37-24-6(1)-(2).  *Id*. at 18.  Defendant also asserts that the SAC does not allege that Plaintiffs suffered damages "in connection with the sale or advertisement of any merchandise[.]"  *Id.* (quoting S.D. Codified Laws § 37-24-6(1)); *see also* D. Reply at 8-9.

S.D. Codified Laws § 37-24-31 provides that "[a]ny person who claims to have been adversely affected by any act or a practice declared to be unlawful by § 37-24-6 shall be permitted to bring a civil action for the recovery of actual damages suffered as a result of such act or

14

practice." Plaintiffs allege that Defendant's conduct constitutes a violation of S.D. Codified Laws § 37-26-6(1). SAC ¶ 99. That subsection provides that

> [i]t is a deceptive act or practice for any person to: … [k]nowingly act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been misled, deceived, or damaged thereby[.]

S.D. Codified Laws § 37-26-6(1). Regarding that last clause, the Supreme Court of South Dakota, has found that a private plaintiff must plead that his or her damages were caused by a violation the SDCPL. *Nygaard v. Sioux Valley Hosps. & Health Sys.*, 731 N.W.2d 184, 196-97 (S.D. 2007).

The SDCPL defines "[a]dvertisement" as "the attempt by publication, dissemination, solicitation, or circulation, whether oral, visual, written, or otherwise, and whether in person, by telephone, or by any other means, to induce directly or indirectly any person to enter into any obligation or to acquire any title or interest in any merchandise[.]" S.D. Codified Laws § 37-24-1(1). "Merchandise" is defined as "any object, wares, goods, commodity, intangible, instruction, or service[.]" *Id*. § 37-24-1(7).

*Northwestern Public Service v. Union Carbide Corp.*, 236 F. Supp. 2d 966, 973-74 (D.S.D. 2002), construed the relevant subsection of the SDCPL to be analogous to common-law fraud in that it requires "an intentional misrepresentation" on Defendant's part. The Court has found that the SAC adequately alleges such misrepresentations. It alleges that Defendant (through salespersons) lied to Plaintiffs about acquiring insurance for them. SAC ¶¶ 48-49, 52, 56. Defendant's use of third parties to transmit those representations does not insulate him from liability under South-Dakota law. *Brookings Mun. Utils., Inc. v. Amoco Chem. Co.*, 103 F. Supp. 2d 1169, 1178 (D.S.D. 2000) (citing *Taggart v. Ford Motor Credit Co.*, 462 N.W.2d 493, 503 (S.D. 1990)).

Plaintiffs, however, do not address whether those representations were made "in connection with the sale or advertisement of merchandise[,]" as is required by the statute. *See* Opp'n at 9. Accordingly, Plaintiffs have not sufficiently alleged a violation under the SDCPL.

### b. SDFCL (Count VI)

In Count VI, Plaintiffs bring a claim under the SDFCL. SAC ¶¶ 117-20. Instead of addressing this statute, Defendant argues that "Plaintiffs' *common law fraud* claims likewise fail." D. Br. at 18 (emphasis added); *see also id.* at 18-19. In reply, Defendant phrases his argument in terms of the SDFCL. D. Reply at 9. As a general rule, courts do not consider new arguments raised in reply briefs. *E.g.*, *Flint Grp. Packaging Inks N. Am. Corp. v. Fox Indus. Inc.*, No. 16-cv-03009, 2020 WL 6156750, at *12 (D.N.J. Oct. 20, 2020). Because Jaffa did not address the statute in his initial motion, the Court denies Defendant's motion on this ground.

### 3. Kansas Subclass (Count IV)

Defendant next argues that Plaintiffs cannot state a claim under the KCPA. D. Br. at 20-22. Jaffa reasons that Plaintiffs are not "consumers" within the meaning of the statute because they were employees, that he is not a "supplier" within the meaning of the statute, that Plaintiffs provide only broad generalizations as to his conduct, and that there are no allegations that Defendant made representations about insurance coverage to Plaintiffs that caused Plaintiffs' harm. *Id.*

The KCPA provides that "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction" and that "[n]o supplier shall engage in any unconscionable act or practice in connection with a consumer transaction." Kan. Stat. Ann. § 50-626(a); *id.* § 50-627(a). The KCPA defines "consumer" as "an individual, husband and wife, sole proprietor, or family partnership who seeks or acquires property or services for personal, family,

household, business or agricultural purposes." *Id.* § 50-624(b).  "Supplier" is defined as "a manufacturer, distributor, dealer, seller, lessor, assignor, or other person who, in the ordinary course of business, solicits, engages in or enforces consumer transactions, whether or not dealing directly with the consumer." *Id.* § 50-624(l).  And a "consumer transaction" is "a sale, lease, assignment or other disposition for value of property or services within this state, except insurance contracts regulated under state law, to a consumer; or a solicitation by a supplier with respect to any of these dispositions." *Id.* § 50-624(c).  Kan. Stat. Ann. §§ 50-626(b)(1)-(14) provides a nonexclusive list of "deceptive acts and practices", and Kan. Stat. Ann. §§ 50-627(b)(1)-(7) provides a nonexclusive list of circumstances for courts to consider when "determining whether an act or practice is unconscionable[.]"

Therefore, to state a claim under the KCPA, plaintiffs must adequately allege "that (1) plaintiffs were consumers under the KCPA, (2) defendants were suppliers under the KCPA, (3) defendants engaged in a deceptive or unconscionable act or practice . . ., and (4) plaintiffs were 'aggrieved' by such act." *In re Motor Fuel Temperature Sales Pracs. Litig.*, 279 F.R.D. 598, 604-05 (D. Kan. 2012); *see also Robbins v. Dyck O'Neal, Inc.*, 447 F. Supp. 3d 1100, 1108 (D. Kan. 2020).  The KCPA does not define "aggrieved," but the Court of Appeals of Kansas has explained that to be "aggrieved," a plaintiff must "show that she was legally harmed and that her harm was causally connected to" the defendant's conduct.  *Hernandez v. Pisotnik*, 472 P.3d 110, 117 (Kan. Ct. App. 2020).   Finally, courts construe the KCPA generously to accomplish the Kansas legislature's goals in enacting the statute.  *Id.* at 116 (citing Kan. Stat. Ann. § 50-623).

Plaintiffs argue that their status as "employees" is irrelevant because they are "consumers" under the statutory criteria insofar as they are "individuals" who sought "property" and "services," *i.e.*, insurance coverage.  Opp'n at 11.  Defendant counters that Plaintiffs do not refer the Court to

any cases to support the proposition that the act applies to an employment relationship.  D. Reply at 9.  Given the plain language of the statute, the Court finds that Plaintiffs are "consumers," given that they are individuals who sought property and services.  *See* Kan. Stat. Ann. § 50-624(b).

Plaintiffs further argue that Defendant is a supplier because when soliciting the employees to enroll in the insurance plans, he engaged in and enforced consumer transactions in the ordinary course of business.  Opp'n at 11.  However, the SAC does not allege what Defendant's "ordinary course of business" was other than to indicate that Jaffa was the sole member of an entity that purported to employ Plaintiffs.  Again, a "supplier" is one who "*in the ordinary course of business*, solicits, engages in or enforces consumer transactions, whether or not dealing directly with the consumer."  Kan. Stat. Ann. § § 50-624(l) (emphasis added).  Therefore, to determine whether Defendant is a "supplier," the Court must be able to assess Defendant's ordinary course of business.  *See Watkins v. Roach Cadillac, Inc.*, 637 P.2d 458, 460 (Kan. Ct. App. 1981) (assessing defendant's ordinary course of business to determine whether it was a "supplier"); *Williamson v. Amrani*, 152 P.3d 60, 65 (Kan. 2007), *superseded by statute*, 2007 Kan. Sess. Laws 194 (applying plain language of Kan. Stat. Ann. § 50-624(j) to reason that "[a] physician is, in the ordinary course of business, a seller or supplier of services.").  *Cf. Bates v. Flemming*, No. 19-1101-JWB, 2019 WL 4193981, at *10 (D. Kan. Sept. 4, 2019) ("Reviewing the amended complaint, there are no facts that would support a finding that Flemming is a supplier.  Although Flemming has engaged in this sale transaction, Plaintiffs have not alleged sufficient facts showing that he engages in consumer transactions in the *ordinary* course of his business.") (emphasis in original).

The SAC does not sufficiently describe Defendant's ordinary course of business so the Court cannot determine whether Defendant engages in consumer transactions as a "supplier."  Accordingly, the Court finds that Plaintiffs have not adequately stated a claim under the KCPA.

### 4. Nebraska Subclass (Count V)

Next, Defendant argues that Plaintiffs have failed to state a claim under the NCPA because the Act was not meant to apply to employment relationships and because Defendant's complained-of conduct does not sufficiently impact the public interest.  D. Br. at 22-24.

The NCPA provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce shall be unlawful."  Neb. Rev. Stat. § 59-1602. The Act defines "trade and commerce" as "the sale of assets or services and any commerce directly or indirectly affecting the people of the State of Nebraska[.]"  *Id*. § 59-1601(2).  The Supreme Court of Nebraska has found that this subsection "limit[s] the disputes that fall within the ambit of § 59-1602 to unfair or deceptive acts or practices that affect the public interest."  *Nelson v. Lusterstone Surfacing Co.*, 605 N.W.2d 136, 141 (Neb. 2000).

Defendant relies on two cases as to the public-interest requirement, *Nelson* and *Ordosgiotti v. Werner Enterprises, Inc.*, No. 8:20-CV-421, 2021 WL 826504 (D. Neb. March 4, 2021)).  In *Nelson*, the plaintiff sued the defendants for purposefully omitting to tell him that the Jeep he purchased from them had previously had a "prior salvage designation" on the certificate of title when defendants acquired it, telling him instead that the Jeep had only been in a fender-bender. 605 N.W.2d at 139-40.  The Supreme Court of Nebraska found that the NCPA did not apply to the transaction.  *Id.* at 142.  The *Nelson* court stated that "[t]o be actionable under the [N]CPA, . . . the unfair or deceptive act or practice must have an impact upon the public interest.  The act is not available to redress a private wrong where the public interest is unaffected."  *Id.* at 141-42.  The court commented that the state legislature had not intended the statute to "even apply to transactions in the context of flea markets or garage sales."  *Id.* at 142.  Because Nelson had not shown that the sale of the Jeep affected anyone but the buyers and sellers or that there was a larger

direct or indirect impact on the public, the court held that a claim under the NCPA was not viable. *Id*. *See also Arthur v. Microsoft Corp.*, 676 N.W.2d 29, 36 (Neb. 2004).

*Ordosgiotti* was a putative class action.  2021 WL 826504, at *1.  The plaintiff sued the defendant, Werner, on behalf of truck drivers who had previously contracted with Werner.  *Id.* The plaintiff alleged that the defendant fraudulently induced the drivers to enter into contracts with Werner by misrepresenting key facts, including as to pay, opportunities for work, and high turnover rate.  *Id.*  The *Ordosgiotti* court found that NCPA did not apply.  *Id.* at **6-7.  Relying on *Nelson,* the court in *Ordosgiotti* found that the complaint did "not adequately allege a direct or indirect effect on the people of the State of Nebraska for purposes of the [N]CPA."  *Id.* at *7. Instead, the court explained, "Ordosgoitti claims only that Werner aimed its allegedly deceptive advertising at drivers it was recruiting to enter into contracts with it, not the general public."  *Id.*

In the SAC, Plaintiffs do not appear to allege that their case implicates the public interest. In their opposition, Plaintiffs argue that their case implicates the public interest because Defendant could have defrauded thousands of citizens of Nebraska who worked in nineteen nursing homes in that state.  Opp'n at 13.  While the SAC does make reference to Nebraska nursing homes, it makes no reference to the number of employees at the facilities.  Plaintiffs cannot amend their pleading through their briefing.  *Commonwealth of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) ("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.") (quoting *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1107 (7th Cir.1984)).  In addition, *Ordosgiotti* was also a putative class action.  But the *Ordosgiotti* court did not focus on the size of the class or the amounts at stake in the transactions. Rather, because the complaint in that case only alleged that Werner targeted certain drivers with deceptive advertising, and not the public at large, the court dismissed the claim.  The difference

between a claim that impacts the public interest and one that does not is in the nature of the claim. *See Arthur*, 676 N.W.2d at 37-38 ("The Act was intended to be an antitrust measure to protect Nebraska consumers from monopolies and price-fixing conspiracies.   The limitation that the Legislature placed on the Act was that it could not be used to address a private wrong where the public interest was unaffected.") (citing *Nelson*, 605 N.W.2d at 142).   Because Defendant allegedly targeted only Cornerstone employees with deceptive statements, the Court finds that Plaintiffs have not adequately pled that Defendant's behavior impacted the public interest so as to be actionable under the NCPA.

### 5. Arkansas Subclass (Count VII)

Jaffa next seeks to dismiss the ADTPA claim against him.   Defendant argues that the SAC does not adequately allege that he engaged in conduct that is unlawful under the statute, that the act does not apply to the relationship between Defendant and Plaintiffs, and that the SAC does not contain facts showing Defendant's culpable state of mind.   D. Br. at 24-25.   Plaintiffs respond that they have pled sufficient facts to support the claim.   Opp'n at 14-15.

The ADTPA provides that

> [a]ny person who suffers an actual financial loss as a result of his or her reliance on the use of a practice declared unlawful by this chapter may bring an action to recover his or her actual financial loss proximately caused by the offense or violation, as defined in this chapter.

Ark. Code Ann. § 4-8-113(f)(1)(A).   The following subsection mandates that "[a] private class action under this subsection is prohibited unless the claim is being asserted for a violation of Arkansas Constitution, Amendment 89." *Id*. § 4-8-113(f)(1)(B).[4]   Finally, Ark. Code Ann. § 4-

---

[4] In light of this restriction, Plaintiffs "concede that this claim can only proceed on an individual basis." Opp'n at 14 n.3.

88-113(f)(2) provides that, "[t]o prevail on a claim brought under this subsection, a claimant must prove individually that he or she suffered an actual financial loss proximately caused by his or her reliance on the use of a practice declared unlawful under this chapter."

Plaintiffs cite to *Valor Healthcare, Inc. v. Pinkerton*, No. 08-6015, 2008 WL 5396622, at *3 (W.D. Ark. Dec. 23, 2008).  Opp'n at 14.  In that case, the court ruled that a corporation who was "not a consumer[]" could state a claim under ADTPA because a corporation is a "person" within the act.  2008 WL 5396622, at *3 (quoting and discussing Ark. Code Ann. §§ 4-88-102(5), -113(f)).  However, the Arkansas Supreme Court has instructed that an ADTPA claim requires a "consumer-oriented act[.]"  *See, e.g.*, *Apprentice Info. Sys., Inc. v. DataScout, LLC*, 544 S.W.3d 536, 539 (Ark. 2018) ("Here, the circuit court clearly erred in finding that DataScout was a consumer for purposes of the ADTPA.  AIS and DataScout were competitors in the market of selling counties' public data, and there is simply no 'consumer-oriented act' as required for a cause of action under the ADTPA.").  For example, in *Stone Bridge Collection, Inc. v. Carmichael*, 791 F.3d 811, 822 (8th Cir. 2015), the Eighth Circuit held that the plaintiff had not stated a claim under the ADTPA because the plaintiff "failed to establish that defendants' acts of conversion and fraud were consumer-oriented or impacted consumers in any way."  The Eighth Circuit observed that Arkansas courts had not applied the ADTPA to business dealings between manufacturers and their distributors where the customers themselves had not been defrauded or deceived.  *Id.*

The Court finds that Plaintiffs have not sufficiently alleged a consumer-oriented act on Defendant's part.  Count VII is dismissed.

### 6. Common-Law Claims (Counts VIII-X)

Finally, the SAC brings three common-law claims for breach of fiduciary duty, negligence, and conversion.  SAC ¶¶ 128-42.  The parties agree that the elements of those torts are substantially

the same across states and argue them as rising and falling together.  D. Br. at 26, 27; Opp'n at 15, 16, 17.

### a. Breach of Fiduciary Duty (Count VIII)

The parties agree that a predicate for a claim of breach of fiduciary duty is the existence of such a fiduciary relationship between them.  D. Br. at 26-27; Opp'n at 15.  Defendant argues that the SAC does not adequately allege that the parties had such a relationship.  D. Br. at 26.  Plaintiffs counter that Defendant fostered a relationship of trust, had "superior knowledge, skill and abilities[,]" and that there was a disparity of bargaining power between the parties, such that Plaintiffs reposed trust and confidence in Defendant regarding his promise to procure insurance for them.  Opp'n at 15-16.

The Court agrees with Defendant and finds the paragraphs of the SAC on which Plaintiffs rely to be conclusory.  *See, e.g.*, SAC ¶ 130 ("This special relationship was developed by virtue of the nature of the supposedly superior knowledge, skill and abilities, and the enormous disparity of power and unequal bargaining position that the Defendants had over their employees.").  The SAC fails to provide sufficient factual support for these allegations.

The Court finds that Plaintiffs have not sufficiently stated a claim for breach of fiduciary duty.

### b. Negligence (Count IX)

Defendant next argues that the SAC does not state a claim for negligence.  After reciting the elements, Defendant argues in one sentence that the SAC's allegations do not satisfy any of the traditional elements of the tort.  D. Br. at 27.  Plaintiffs respond by quoting *Klump v. Nazareth Area School District*, 425 F. Supp. 2d 622 (E.D. Pa. 2006), for the proposition that they do not need to plead the elements of their claim for negligence with specificity, but argue, again invoking

*Klump*, that their pleading of Defendant's intentional torts suffices to state a claim for negligence as well.  Opp'n at 17.

The Court observes that *Klump* was decided under the since-abrogated notice pleading standard of *Conley v. Gibson*, 355 U.S. 41 (1957).  *Klump*, 425 F. Supp. 2d at 631-32, 643.  The *Klump* court ruled that the plaintiffs in that case were "not required to plead each element of their claim with specificity."  *Id.*  This is no longer the standard.  Rather, "in order to state a claim on which relief can be granted, a plaintiff must plead facts sufficient to suggest the required elements of the claim[.]"  *Adegbuji v. Green*, 280 F. App'x 144, 148 (3d Cir. 2008) (citing *Philips*, 515 F.3d at 234).  *Klump*, then, is not persuasive on that point.

While Plaintiffs have cited the wrong legal standard, Defendant has only provided a cursory argument.  Because Defendant's analysis is utterly lacking, the Court denies Defendant's motion on this ground.

### c. Conversion (Count X)

Finally, Defendant argues that Plaintiffs have failed to state a claim for conversion.  D. Br. at 27-29.  Plaintiffs maintain that the SAC has put forth facts addressing the elements of conversion.  Opp'n at 17-18.  Plaintiffs rely on *Dougherty v. Drew University*, 534 F. Supp. 3d 363 (D.N.J. 2021), and *Glenfed Financial Corp. v. Penick Corp.*, 647 A.2d 852 (N.J. Super. Ct. App. Div. 1994).  *Id.* at 17-18.

The Court observes that *Dougherty* and *Glenfed* were decided under New Jersey law, and neither party discusses why New Jersey is applicable.  Thus, assuming without deciding that New Jersey law controls, the Court reviews the claim under New Jersey law.  The Supreme Court of New Jersey has explained that, as to conversion, a plaintiff must allege that there was "some repudiation by the defendant of the owner's right, or some exercise of dominion over them by him

inconsistent with such right, or some act done which has the effect of destroying or changing the quality of the chattel." *Meisels v. Fox Rothschild LLP*, 222 A.3d 649, 660 (N.J. 2020) (quoting *Frome v. Dennis*, 45 N.J.L. 515, 516 (N.J. Sup. Ct. 1883)). A party may advance a claim of conversion of money "provided that 'the money ha[s] belonged to the injured party and that it be identifiable.'" *Meisels*, 222 A.3d at 660 (alteration in original) (quoting *Chi. Title Ins. Co. v. Ellis*, 978 A.2d 281, 288 (N.J. Super. Ct. App. Div. 2009)). If the defendant's possession of the plaintiff's property "is initially lawful, it is not tortious unless and until the possessor acts in a way that conflicts with the true owner's rights." *Meisels*, 222 A.3d at 661.

In *Dougherty*, plaintiff Angel Dougherty was a student at Drew University, and plaintiff Crista Dougherty was her mother. 534 F. Supp. 3d at 370. After Drew University transitioned its operations from in-person to virtual to cope with the COVID-19 pandemic, the plaintiffs sued the University, bringing a claim for conversion, among others. *Id.* at 370, 379-80. The plaintiffs claimed that Drew University had converted the plaintiffs' tuition payments. *Id.* at 380. The court explained that to be a cognizable subject of a conversion claim, the money at issue had to "be 'identifiable.'" *Id.* (quoting *Meisels*, 222 A.3d at 660-61). The *Dougherty* court continued that the plaintiff must be able to argue "that a particular pot of money was taken or wrongfully diverted to the defendant's own use" because "[a] claim for conversion … must be distinguished from a debt, or a claim that one is owed money as the result of a breach of contract." 534 F. Supp. 3d at 380. The court in *Dougherty* dismissed the conversion claim insofar as it sought tuition. *Id.* Comparing the remedies sought for the breach of contract and conversion claims, the court concluded that they were the same—expectation damages. *Id.* The court explained that "[b]oth seek money representing the difference in value between the virtual education provided and the in-person education expected. That is the 'traditional remedy for breach of contract.'" *Id.* (quoting

*Goldfarb v. Solimine*, 245 A.3d 570, 577 (N.J. 2021)).  The court therefore dismissed that claim insofar as it sought tuition.  *Dougherty*, 534 F. Supp. 3d at 380.

The Court agrees with Plaintiffs that the money at issue was identifiable.  Plaintiffs allege that Defendant withheld a specific sum of money from each paycheck, which was earmarked for insurance premiums.  This money, which was part of Plaintiffs' earned wages, belonged to them and is specific and identifiable.  Once Defendant failed to forward that money to the insurance plan administrators, he acted in a manner plainly contrary to Plaintiffs' rights and intentions.  The money that Plaintiffs seek is not a debt or expectation damages but their own diverted property.  The Court finds that Plaintiffs have adequately stated a claim for conversion. [5]

The Court also finds that, in addition to alleging facts that satisfy the criteria for a claim of conversion,[6] Plaintiffs have stated a claim against Defendant personally.  In *Glenfed*, the defendant Penick Corporation was wholly owned by defendants Aris Christodoulou and his wife, Marilena Christodoulou.  647 A.2d at 855.  The plaintiff corporation loaned $5 million to Penick.  *Id.*  After Penick encountered financial difficulties, the Christodoulouses diverted money Penick received into the company's standard operating accounts.  *Id.*  The plaintiff sued, including a claim of conversion against the Christodoulouses.  *Id.*  The Appellate Division held that the plaintiff could pursue that claim and that the Christodoulouses were personally liable.  *Id.* at 861.  The court in *Glenfed* observed "that the officers of a corporation are personally liable to one whose money or property has been misappropriated or converted by them to the uses of the corporation, although

---

[5] Although Plaintiffs argue the motion in terms of New Jersey law, neither they nor Defendant address the pre-suit demand requirement that New Jersey law imposes on parties seeking to bring claims of conversion.  *See Meisels*, 222 A.3d at 660-61.  Because the parties do not discuss this requirement, the Court does not.

[6] Except for the demand requirement discussed in note 5, *supra*.

they derived no personal benefit therefrom and acted merely as agents of the corporation." *Id.* (quoting *Hirsch v. Phily*, 73 A.2d 173, 177 (N.J. 1950)). The *Glenfed* court found that Penick committed conversion by diverting the money and that Aris had expressly authorized that diversion, rendering him liable. *Glenfed*, 647 A.2d at 861. Additionally, the court observed that Marilena was Penick's "Executive Vice President and Chief Financial Officer[.]" *Id.* In those roles "she worked directly with her husband in the management of the corporation and supervised its financial department." *Id.* The Appellate Division found her "central role in" Penick's management to be enough "to support an inference that Mrs. Christodoulou participated, or at least acquiesced, in the diversion." *Id.* Accordingly, the *Glenfed* court concluded that she too was liable for conversion, even absent direct evidence of her involvement in the diversion. *Id.*

The Court finds *Glenfed* persuasive and adopts its reasoning. Like the Christodoulouses, Jaffa played a central role in the daily affairs of the entity accused of converting Plaintiffs' money. Jaffa was Cornerstone's sole member and Plaintiff have not alleged that the entity had any other employees (other than Plaintiffs themselves).

The Court finds that Plaintiffs have stated a claim against Defendant personally for conversion.

## IV.    CONCLUSION

For the reasons stated above, the motion is granted in part and denied in part. An appropriate Order accompanies this Opinion.

Dated: April 13, 2022

John Michael Vazquez, U.S.D.J.